UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


LEO J. McHUGH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        Civ. No. 07-160-B-W
                                        )
BRINK'S, INCORPORATED,                  )
                                        )
            Defendant.                  )


RECOMMENDED DECISION

Leo J. McHugh worked as a "driver" for Brink's, Incorporated, at its Bangor branch for several years before undergoing bypass surgery in early 2005.  McHugh's recovery period extended beyond his leave entitlement under the Federal Medical Leave Act and he sought to recommence working at Brink's approximately seven months after his departure on leave. Brink's declined to return McHugh to his former position on the ground that it had filled all available posts and was fully staffed at the time McHugh sought to return.  Four or five months later Brink's advertised positions in the Bangor Daily News and hired other individuals for "messenger" positions without specially notifying McHugh of the openings or offering the positions to him on a preferential basis.  McHugh brought this civil action in state court alleging disability discrimination and whistleblower retaliation in violation of Maine law.  Brink's removed the action to this court on the grounds of diversity of citizenship and, following discovery, filed a motion for summary judgment.  The Court referred the motion to me for a report and recommendation and, based on my review of the summary judgment record and the parties' respective legal memoranda, I now recommend that the Court grant the motion.

**Facts**

The following facts are material to the defendant's motion for summary judgment. The facts are drawn from the parties' statements of material facts filed in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Factual disputes have been resolved in favor of the non-movant, Leo McHugh, and the recitation of a "fact" herein does not necessarily mean that it is undisputed by Brink's.

Brink's is in the business of transporting, protecting and storing valuables for its customers. It provides this service through employees who operate out of armored trucks. The jobs the employees are detailed to fall into three categories: driver, messenger, and guard. The driver operates the armored truck and keeps a lookout during stops. The messenger exits the truck to collect valuables, interact with customers, and complete related paperwork at pick-up and drop-off locations. The messenger is also detailed to reload and balance automated teller machines for customers requiring that service. The guard, when needed, is detailed to shadow and protect the messenger when he or she is carrying cash or valuables to or from the truck. (Movant's Statement (MS) ¶¶ 4-8, 10-13, 18, Doc. No. 22.) The messenger occupies the most dangerous position of the three because he or she is the one who holds the purse outside of the truck and, therefore, is the one whom any half-way intelligent heister would target during a hold-up. (Id. ¶ 14.) Due to this heightened danger, messengers are paid at a higher hourly rate than

2

drivers having the same seniority.[1]  (Id. ¶ 15;  Non-Movant's Statement (NMS) ¶ 15, Doc. No. 26.)  A messenger with the appropriate DOT certification can perform the driver duties.[2]  On the other hand, a driver who wishes to be a messenger must complete some additional training, which amounts to shadowing a messenger for three weeks and learning how to interact with customers, complete the required paperwork and perform "ATM replenishments."  (MS ¶¶ 16-17;  NMS ¶¶ 16-17;  Woodruff Dep. 4, Doc. No. 27.)  Brink's employees are often hired first as drivers then promoted to the position of messenger upon receiving the appropriate training.  In addition to Ms. Woodruff, there have been at least four other Bangor branch employees who started as a driver and transitioned to a messenger position.  Drivers and messengers are considered to be of equal rank on board the Brink's truck in that one does not command the other.  (NMS ¶¶ 190-193.)

Brink's hired Leo McHugh in 1997 as a part-time driver at its Bangor branch.  (MS ¶ 47.)  By mid-1998, McHugh was a full-time driver.  McHugh remained in the driver position throughout his employment at Brink's.  Although he served as a guard on an occasional run, he never served as a messenger.  Nor was he ever trained as a messenger.  (Id. ¶¶ 48-51.)  According to McHugh, he twice asked Carl Siefken, a branch manager who left Brink's in 2002, about possibly training for a messenger position, but did not ask again after that because Siefken never arranged for it to happen.  (Id. ¶¶ 38, 52.)  Consequently, McHugh never asked his subsequent branch manager, Donna Wing, for messenger training and she has no recollection of

---

[1]    "Sometimes" a messenger can make less than a driver.  (Non-Movant's Statement ¶¶ 15, 246, Doc. No. 26; Woodruff Dep. 49, Doc. No. 27.)  It is unclear from this qualification whether the sometimes refers to situations when the driver has more seniority than the messenger or when a given driver works more hours than a given messenger.

[2]    Brink's drivers are governed by Department of Transportation (DOT) regulations pertaining to the Federal Motor Carrier Safety Act, which has fitness and physical examination requirements, and which requires that Brink's drivers have a valid DOT certification in order to drive.  (MS ¶ 9.)

ever being told that he had an interest in working as a messenger. (Id. ¶¶ 53-54.) Brink's concedes that McHugh might have been a successful messenger had he ever received training and that it is beneficial to have employees who are able to perform all of the duties of both driver and messenger. (NMS ¶¶ 194-195; Movant's Reply Statement (MR) ¶¶ 194-195, Doc. No. 35.)

In 2002, McHugh suffered a back injury due to a broken seat in a Brink's truck that sidelined him for roughly three weeks. When he returned to work he did so with a weight restriction of 25 pounds. Brink's accommodated this restriction by relieving him of responsibility for assisting messengers with loading and unloading the armored trucks while the weight restriction was in place. (MS ¶¶ 55-58; NMS ¶ 199.)

McHugh went on medical leave on February 28, 2005, as a result of a heart condition. He underwent bypass-surgery on or about March 4, 2005, and applied for leave under the Family and Medical Leave Act (FMLA) on March 15, indicating an expected return date of May 31, 2005. (MS ¶¶ 61, 63, 64.) Brink's provided McHugh with a copy of its leave policy (policy 4-4) while he was on leave. (Id. ¶ 67.) That policy permits employees to take a leave of up to four months for a medical condition and provides that an extension may be granted in special circumstances, up to a maximum of 15 months. (Id. ¶ 96.)

McHugh testified that he spoke with a woman from Brink's in Texas about his leave and future job reinstatement who told him not to worry about his job and to focus on getting well. Ms. Wing made a similar statement to McHugh. When asked by McHugh if he needed to be worried about his job, she told him not to worry about it, just to get better. (NMS ¶¶ 218-219; McHugh Dep. 184:2-13.)

During the summer of 2005, McHugh paid a social visit to the Bangor branch and spoke to Beverly Woodruff, the route coordinator who schedules the branch's crews and determines

4

their routes.  (MS ¶¶ 44, 45, 68.)  Woodruff indicated to McHugh that she could make use of him if he were available.  (Id. ¶¶ 69-70; NMS ¶ 220.)  However, McHugh did not communicate a readiness to work.  Nor did he indicate when he might be ready to return to work.  (MS ¶ 71.)

On August 4, 2005, Brink's sent McHugh a letter stating that his company-paid medical benefits would expire effective August 28, 2005, and that he could elect continued coverage under COBRA.  McHugh presented himself at the Bangor branch on August 25 and reported to Ms. Woodruff that he would be ready to return in approximately one month.  This was the first indication from McHugh about when he might be ready to return to work.  Woodruff informed McHugh that she would call Brink's Lewiston branch office to advise Donna Wing that he wished to return to work.  Woodruff called Wing and relayed that McHugh would be ready to return in one month.  (Id. ¶¶ 72-78.)

On September 21, 2005, McHugh provided Woodruff with a signed note from his physician's assistant (PA), stating:  "Leo may return to work without restrictions.  He is fully recovered."[3]  (Id. ¶¶ 79-80; NMS ¶ 80.)  Woodruff forwarded the note to Wing in Lewiston (her primary office) via fax.  (MS ¶ 81.)  She also called Wing by speaker phone while McHugh was in the office and a conference call occurred.  McHugh asked whether there would be a problem with his returning and Wing responded that there would not be a problem, but that she "never had anyone out for the kind of illness [he was] out for" and she did not know whether Brink's would want him to see one of its doctors for a physical.  According to Wing, she was concerned, in particular, about any potential restrictions that might exist due to Department of Transportation regulations.  Neither Woodruff, who determines staffing needs in Bangor, nor

---

[3]         McHugh raises a hearsay objection, but the obvious reason why Brink's introduces this evidence is to demonstrate why Brink's would not have regarded McHugh as disabled and why there would be a record that he was no longer disabled, assuming that he was disabled during his leave of absence.

Wing, who manages Woodruff and the Bangor branch, ever suggested to McHugh that Brink's was fully staffed at the time.  (NMS ¶¶ 82, 84-85, 222-224.)

According to Woodruff and Wing, the Bangor branch was actually fully staffed in September 2005 when McHugh presented himself.  (MS ¶ 89.)  Wing contacted Brink's employee relations director, Michael Sica, located in Brooklyn, New York.  Wing told Sica, who was responsible for providing human resources services and support to Brink's managers and employees in the northeast region, that the Bangor branch was fully staffed and asked him whether she was required to lay another worker off in order to put McHugh back to work.  (Id. ¶¶ 86-88, 90-91.)  According to Wing, Sica got back to her after a period of time and told her that she was not required by law to reinstate McHugh because he exceeded his 12-week entitlement to leave under the FMLA.  (Id. ¶¶ 93-94, 97.)

On September 27, 2005, Wing telephoned McHugh and informed him that he would not be reinstated to his former position because he had been replaced during his absence and there were no vacant driver positions at the Bangor branch, but she offered him a driver position with the Lewiston branch.  McHugh declined the Lewiston position because it would require an extended commute from Bangor to Lewiston.[4]  McHugh complained that it was not fair and Wing told him that she would have Mr. Sica call him to explain.  When Sica called a few days later, he told McHugh that he was still on the payroll, which prompted McHugh to ask why he was not receiving any paychecks.  Brink's offers by way of explanation that McHugh was still classified as being on leave under Brink's policy 4-4 and that he was "eligible for recall to a driver position" in Bangor should one become available.  Sica did not explain the potential for

---

[4]        The drive from Bangor to Lewiston is over 100 miles.

recall to McHugh during their phone conversation.  (MS ¶¶ 101-104, 107;  NMS ¶¶ 101, 105-107, 225-228, 231.)  In fact, McHugh never received any pay from Brink's after September 27, 2005.  (NMS ¶ 233.)  According to McHugh, he complained to Sica that he was being treated unfairly because other workers had left on medical leave and were reinstated to their positions when they returned.  (NMS ¶ 228.)  However, McHugh does not offer any evidence that would compare his extended period of leave to the leave taken by others.  In reply, Brink's offers evidence that none of the other individuals were on leave for more than six weeks, whereas McHugh remained on leave for more than six months.  (MR ¶ 228.)

For his part, McHugh states that he understood that he was "terminated" after he spoke with Wing on September 27, 2005.  (NMS ¶¶ 112, 227.)  However, McHugh received a letter from Brink's in October 2005 that made him think he was still an employee.  (MS ¶ 112; McHugh Dep. 110.)

Brink's offers that it formally "terminated" McHugh's employment on May 28, 2006, because no vacancies for driver jobs occurred during McHugh's fifteen months of leave, the maximum amount of administrative leave available under Brink's policy.  (Id. ¶ 116.)

*

The Bangor branch typically staffs its trucks with two employees:  one driver and one messenger.  During 2005 and 2006, the branch typically staffed its trucks as follows:

*Mondays and Fridays*:  two runs requiring two drivers and two messengers.

*Tuesdays through Thursdays*:  four runs requiring four drivers and four messengers.

*Saturday*:  one run requiring one driver and one messenger.

*Once per week in the summer*:  one run to Bar Harbor requiring one driver and two messengers, one of whom serves as a guard.

7

Because employees trained as messengers could serve as drivers, Brink's did not need four employees designated strictly as drivers to operate its runs, even on the busiest days. (Id. ¶¶ 121-127.)

On three days of the week Brink's needs class B drivers. Four employees other than McHugh had class B licenses. (NMS ¶¶ 197-198.)

Brink's had a need for messengers in February 2005 and placed an advertisement for messengers in the newspaper on or about February 2, 2005. Brink's placed this advertisement before McHugh's departure and before Brink's had knowledge that McHugh would need leave or had a health condition. As a result of this advertisement, Brink's hired three of the various people who applied, two as full-time messengers and one as a part-time messenger. These people were hired February 28, 2005, the day after McHugh went out on leave. As of their hiring, the Bangor branch had two full-time drivers, four full-time messengers, and four part-time messengers. In addition to these employees, the Bangor branch had a cashier and Ms. Woodruff who both worked as drivers or messengers on an as-needed basis. In April 2005, Brink's hired a part-time messenger to replace a part-time messenger who resigned. (MS ¶¶ 128-135.)

In June 2005, Brink's advertised two more openings for messengers at the Bangor branch, resulting in two more new hires. Brink's hired these new employees while McHugh was still on leave and before Brink's had knowledge as to whether or when McHugh might return to work. These were the last hires for 2005 at the Bangor branch and they brought the number of employees to 13, three of whom were part-time. (Id. ¶¶ 140-145.) Brink's asserts that the

8

Bangor branch was fully staffed from July through the end of 2005 and supports its statement with sworn testimony from Wing and Woodruff.  (Id. ¶ 146.)

One of Brink's employees, a member of the National Guard, was called to active duty in 2005.  The parties dispute when he was called to duty.  Brink's maintains it was in the spring of 2005 with an anticipated return in October.  (Id. ¶¶ 136-139.)  McHugh states that the employee left for active duty in the fall of 2005, which is what Woodruff and Wing testified to at their depositions.[5]  (NMS ¶¶ 138, 235.)  McHugh maintains that Wing should have offered him the guardsman's messenger position, which she would have known about in September 2005 when he presented himself as ready to return.  (Id. ¶¶ 236-238.)  He posits that, had McHugh been afforded a chance to fill in for the guardsman as a messenger, he would have been in a position to fill a new messenger opening in 2006.  In February and March of 2006, while McHugh was still classified by Brink's as on leave of absence, two full-time and one part-time messenger positions were vacated and filled at Brink's Bangor branch.  (Id. ¶¶ 239-244;  MS ¶ 118.)

*

Brink's asserts that neither Wing nor Sica considered McHugh to be disabled upon his request to return to work.  Brink's supports this assertion based on declarations sworn to by Wing and Sica, and based on the PA's note stating that McHugh was fully recovered and could return to work without restrictions.  (MS ¶ 109.)  Additionally, McHugh did not ask for any accommodation of any physical or mental disability, and Brink's did not inquire as to whether he needed any accommodation at the time of his request for reinstatement in September 2005.  (Id. ¶ 110.)

---

[5]     Woodruff and Wing have changed their prior testimony to state that the guardsman went on active duty in the spring and was scheduled to return in October 2005.  Woodruff initially did so by means of her deposition errata sheet.  (See Supp. Woodruff Decl. ¶¶ 5-6, Doc. No. 37.)  For her part, Wing states that she knew that the guardsman employee would be entitled to reinstatement upon his return.  (Supp. Wing. Decl. ¶ 7, Doc. No. 36.)

Neither Wing nor Woodruff ever criticized or complained about McHugh's work.  Nor was McHugh ever written up or disciplined during his employment with Brink's.  He was regarded as a good driver and consistently received wage increases.  (NMS ¶¶ 173-175.) However, McHugh also asserts that another Brink's employee who briefly filled in for Siefken until Wing was hired told him that management was "out to get him" and was "looking for an excuse."[6] (Id. ¶ 210.)

On October 6, 2005, Brink's contested McHugh's application for unemployment benefits on the ground that he was unavailable for work.  (Id. ¶ 245.)

On November 10, 2005, McHugh filed a charge of discrimination with the Maine Human Rights Commission (MHRC) that alleged wrongful termination motivated by disability discrimination and whistleblower retaliation.  (MS ¶ 1.)

In his complaint, filed in state court in September 2007, McHugh alleges that Brink's "intentionally terminated [his] employment on September 27, 2005," thereby violating his rights under the Maine Human Rights Act and the Maine Whistleblower Protection Act.  (Compl. ¶¶ 17, Doc. No. 1-2.)  There is no allegation that Brink's discriminated against McHugh, however, with respect to any other discreet employment decision subsequently made in 2006, after the commencement of adversarial administrative proceedings before the MHRC.

---

[6]      Brink's raises a hearsay objection in its reply statement.  (MR ¶ 210.)  A statement by a manager made within the scope of employment is an admission under Rule 801(d)(2)(D) of the Federal Rules of Evidence, taking it out of the hearsay rule.  McDonough v. City of Quincy, 452 F.3d 8, 21 (1st Cir. 2006).  If the person were a manager, this evidence would not be hearsay.  However, Brink's got the last word on this issue in an unobjected to pleading wherein it introduced record evidence that Jason Marquis, the person who allegedly made the statement, was employed in non-exempt, hourly positions while working for Brink's.  His Brink's employment ended in April 2003, more than two and a half years prior to the September 2005 employment action that forms the basis for the complaint.  I sustain the hearsay objection and I also conclude this statement is irrelevant because it has no temporal relationship to these events.  Thus I have not considered this statement in my recommendation, although I have set it forth in the facts.

Brink's states that it kept McHugh classified as an employee on leave of absence under its own leave policy through May 27, 2006, "pending a vacancy" in a driver position at the Bangor branch. (MS ¶ 114.)  There is no evidence indicating that McHugh ever communicated with the staff or management of Brink's Bangor branch after his September conversation with Sica. (Id. ¶ 111.)  There is no evidence as to any negotiations concerning potential alternative employment while the administrative proceedings were pending before the MHRC.  There is no evidence that McHugh desired employment at Brink's after he was denied reinstatement in September 2005.

*Facts specific to the whistleblower claim*

Brink's maintains a policy and practice of permitting employees to report workplace issues to management during monthly informal "speak-out sessions" conducted at all branches. Ordinarily, the branch manager attends and conducts these sessions personally.  (MS ¶¶ 23-25.) The parties are agreed that McHugh complained to Brink's about the state of repair of Brink's trucks and about smoking at the Bangor branch throughout his employment at every speak-out session he attended.  (Id. ¶¶ 151-153.)  McHugh's complaints concerned such things as broken seats in the trucks, broken door locks, worn tires, inoperable mobile phones, break downs, brake problems, disconnected gas pedals, and other issues.  McHugh stated once, in March 2002, that it took an OSHA visit to get things fixed at Brink's.  Many of the drivers and messengers employed at the Bangor branch have complained at one time or another about the state of repair of the Brink's trucks, often during speak-out sessions.  McHugh, however, appears likely to have stood out from the others.  In October 2002, Woodruff sent a memo to Siefken complaining that she was tired of listening to McHugh complain.  In 2003, McHugh also complained about the fact that his back injury arose from broken equipment and also about a slip and fall he had on Brink's premises due to ice, saying it was Brink's obligation to provide a safe work environment.

11

McHugh's opinions about how to take care of the trucks caused Ms. Wing to remind him that it was her job (not his) to manage the branch.  (Id. ¶¶ 154-155, 157;  NMS ¶¶ 154, 205-209;  MRS ¶ 209.)

As for smoking, McHugh complained to branch manager Carl Siefken, who left Brink's in 2002, about employees smoking at the branch office and in the trucks.  Siefken directed people to stop smoking in the office and in the trucks.  Consequently, Woodruff, among others, was required to smoke outside.  Some employees continued to smoke in the trucks nonetheless, which McHugh continued to complain about, not just to Siefken, but also to Wing and Woodruff, both of whom are smokers.  McHugh attests that the smoking problem never ceased so long as he worked at Brink's.  McHugh was not the only employee to complain about the smoking issue, but he attests that whenever he complained about smoking to Woodruff, she would give him the "short runs," which did not give as many hours of work, and she once told him not to be such a "pain in the ass."  (MS ¶¶ 164-171;  NMS ¶¶ 212-217.)

One of the speak-out sessions at which McHugh voiced complaints was attended by Mr. Sica while Siefken was still the branch manager (2002 or earlier).  McHugh and Sica, who had not met previously, did not converse at that session other than to say hello to each other.  (MS ¶¶ 180-184.)

### Discussion

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

Brink's argues, as a threshold matter, that McHugh's claim must fail because he was not actually terminated from employment in September 2005, contrary to the wording of his complaint.  (Mot. for Summ. J. at 15, Doc. No. 21;  see also Compl. ¶¶ 11, 17, Doc. No. 6-2.)  Brink's subsequently challenges the existence of a prima facie case.  As to the claim of disability discrimination, Brink's asserts that McHugh cannot establish that he was disabled or regarded as disabled when he presented himself for reinstatement in September 2005.  (Id. at 16-18.)  Brink's also asserts that a prima facie showing of causation is not established by the record.  (Id. at 17.)  Brink's also offers that it did not reinstate McHugh for a valid, nondiscriminatory reason:  it was fully staffed at the time he requested reinstatement.  (Id. at 18-20.)  Brink's observes that, because McHugh exceeded his FMLA leave allotment, there was no legal requirement that Brink's reinstate McHugh upon his request.  (Id. at 20-21.)  As to the whistleblower claim, Brink's concedes that McHugh's complaints about vehicle safety and smoking amounted to protected activity, but that there is no causal relationship between McHugh's complaints and Brink's failure to reinstate him in September 2005.  (Id. at 22-23.)

13

**A.      Prima Facie Disability Discrimination**

To establish a prima facie case of disability discrimination under the Maine Human

Rights Act (MHRA), McHugh must demonstrate that: (1) he has a disability within the meaning

of the MHRA; (2) he is qualified to perform the essential functions of the job, with or without

reasonable accommodation; (3) he was subject to an adverse employment action based in whole

or in part on his disability.  Higgins v. New Balance Athletic Shoe, 21 F. Supp. 2d 66, 71 (D.

Me. 1998); Dudley v. Augusta Sch. Dep't, 23 F. Supp. 2d 85, 93 (D. Me. 1998); Doyle v. Dep't

of Human Servs., 2003 ME 61, ¶ 14, 824 A.2d 48, 54.

*1.    Membership in protected class*

Brink's maintains that it did not regard McHugh as disabled when he sought to return to

work in September 2005.  Brink's flags the September 2005 note from the PA that released

McHugh to work without restriction and described him as fully recovered.  (Mot. for Summ. J. at

16-17.)  McHugh responds that he was an employee with a record of a disability and that his

branch manager, Wing, regarded him as disabled because she expressed uncertainty as to

whether he would have to undergo a physical in order to return to work.  (Mem. in Opposition at

7, Doc. No. 25.)  Brink's does not address McHugh's response on this point in its reply.  I regard

McHugh's presentation on this element to be sufficient under Maine law.

The determination of whether an individual has a disability, is regarded as having a

disability, or has a record of a disability is a factual question that must be determined based on

the totality of the evidence.  See, e.g., Katz v. City Metal Co., 87 F.3d 26, 32-33 (1st Cir. 1996).

Pursuant to the MHRA, an individual qualifies as disabled if, among other alternatives, he or she

has a physical impairment that "significantly impairs" physical health.  5 M.R.S. § 4553-

A(1)(A)(2).[7]  Additionally, under Maine law, "heart disease" is a physical disability, without

regard to its severity.  Id. § 4553-A(1)(B).  An individual who has a record of such a condition or

is regarded by the employer as having such a condition qualifies as disabled.  Id. § 4553-

A(1)(C), (D).  Here, McHugh obtained medical leave under the FMLA for his condition.  Leave

under the FMLA is conditioned on "a serious health condition that makes the employee unable to

perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Finally,

the MHRA states that a significant physical impairment exists where a condition has an actual

duration of more than six months.  5 M.R.S. § 4553-A(2)(B).  McHugh remained on medical

leave for in excess of six months.  Although McHugh would likely be unable to qualify as

disabled under federal law on this record, the record is sufficient to support a finding that

McHugh qualified as disabled under Maine law.

 2.   *Ability to perform*

There is no factual controversy whether McHugh could perform the duties of a driver (or

messenger, with training) at the time he requested reinstatement.

 3.   *Adverse employment action based on disability*

Brink's argues that this action is foreclosed because Brink's did not actually "terminate"

McHugh in September 2005, contrary to the characterization McHugh put in his complaint.

(Mot. for Summ. J. at 15.)  In his complaint McHugh alleges, in notice-pleading style, that "on

September 27, 2005, [Brink's] intentionally terminated Plaintiff's employment because of his

physical disability in violation of the MHRA" and that Brink's "intentionally terminated

Plaintiff's employment on September 27, 2005, in violation of the Maine Whistleblower

---

[7]    McHugh filed his complaint in September 2007, after the enactment and effective date of these provisions.
See Rooney v. Sprague Energy Corp., 519 F. Supp. 2d 131, 133-35 (D. Me. 2007) (discussing legislative
amendments to the MHRA enacted in the wake of Whitney v. Wal-Mart Stores, Inc., 2006 ME 37, 895 A.2d 309).

Protection Act." (Compl. ¶¶ 11, 17). Brink's would have it that, because McHugh was not technically terminated on that date, he cannot go to trial on these pleadings. I do not believe that is a viable legal theory with regard to the failure to reinstate McHugh in September 2005. However, I do agree that McHugh's complaint does not support a claim for any discreet employment decision that may have occurred thereafter, such as with regard to the employment of new messengers in 2006.

I am unaware of any good authority that a plaintiff's allegation of a specific date of "termination," which coincides with the employer's refusal to reinstate him after a period of leave, should prevent the plaintiff from arguing that the employer's decision to replace him and its failure to reinstate him on request amounts to an "adverse employment action," even if it did not amount to a formal termination decision made on the precise date alleged in the complaint. I conclude that McHugh can demonstrate an adverse employment action consisting of being replaced in his job during a leave of absence and being denied reinstatement when he presented himself for that purpose.[8]

I do conclude, however, that McHugh's complaint places a practical limitation on the reach of this case. Specifically, I do not believe that McHugh has a claim in his complaint related to any discrete employment decision made in February or March of 2006 in relation to

---

[8]      Brink's cites Global Naps, Inc. v. Federal Insurance Company, 336 F.3d 59, 66 (1st Cir. 2003), in support of its argument. In Global Naps the First Circuit affirmed an entry of summary judgment against a claim for insurance proceeds arising from an alleged duty on the part of the defendant insurer to defend the plaintiff in an underlying litigation. The relevant insurance policy afforded a defense against claims of malicious prosecution committed in the course of the defendant's business. Id. at 60. The question addressed by the Court was whether the underlying action "adumbrated" a claim against the plaintiff for malicious prosecution. Id. at 60-61. The Court determined that the underlying complaint did not recite the elements of a common law malicious prosecution case so the plaintiff was not entitled to a defense from the insurance company. Id. at 66. If this Court is wondering what possible relation Global Naps has to this case, it understands my own reaction to this argument. It is apparent from a reading of Global Naps that the Court of Appeals was addressing a very dissimilar question of whether a cause of action asserted in an underlying litigation triggered a duty to defend in that litigation. That is a question particular to insurance law that has no logical bearing on the degree of elasticity that exists in the pleadings of this case. Global Naps is not on point.

the hiring of new messengers.  This case is an outgrowth of an administrative charge made in November 2005, alleging wrongful termination.  There is no adequate explanation offered by McHugh as to why, or how, that charge, essentially repeated in his complaint, amounts to a claim for a wrongful refusal to hire for a different position.  I understand that McHugh believes he was a viable candidate for such a position because of his background at Brink's and because any new hire would require the same training that he would require, but he brought his claim based on the failure to reinstate him (in his words, to "terminate" him) in September 2005.  He also started the underlying administrative process in November 2005, months before those positions were advertised and filled.  It is entirely unclear from the record whether any dialogue developed between the parties in relation to McHugh's return to work or whether McHugh even desired reinstatement at that time.  All that is afforded by the record is the fact that McHugh never expressed any interest in employment after September 2005.  I conclude on this record that McHugh's complaint of wrongful termination in September 2005 is not a sufficient foundation in the pleadings for this Court to conduct a trial on distinct employment decisions made with respect to the employment of other individuals, months later, for different positions that McHugh did not seek to fill.

Having addressed these preliminary matters, I turn to consider McHugh's prima facie showing that the failure to reinstate him in September 2005 was based on his disabled status. This is where McHugh's case unravels.  "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'"  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311-12 (1996) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n.7 (1981)).  A plaintiff will ordinarily want to

17

demonstrate a prima facie causal relationship between his or her membership in a protected class and an adverse employment action by showing that he received disparate treatment compared to someone outside of the class.  McHugh has not presented probative evidence about preferential treatment of other employees returning from extended administrative leave.  Nor has McHugh demonstrated that other Brink's employees were ever provided an opportunity to return from leave to enter a vacant position they had not formerly occupied.  McHugh offers a statement that other employees returned from their medical leaves, without offering any salient details (NMS ¶ 228), a statement that Wing expressed uncertainty as to whether McHugh would need to see a company doctor before returning (NMS ¶ 223), and a statement that Wing and Woodruff did not suggest to him that the Bangor branch was fully staffed at that time (NMS ¶ 224).

As for disparate treatment, Brink's responds that none of the individuals who returned to work following leave were on leave for near as long as McHugh, the longest medical leave being six weeks.  (MR ¶ 228.)  It is not apparent from the record whether the other employees were entitled to reinstatement or not.  Pointedly, McHugh offers no explanation why Brink's reinstatement of those others would suggest a causal connection between his own medical condition and the failure to reinstate him upon request.  Nor does McHugh attempt to depict the others as having taken medical leave for reasons unrelated to what would amount to a "disability" under Maine law.

As for Wing's comment about McHugh possibly needing to see a doctor, and the silence about staffing levels, I am not persuaded that any inference of causation arises from these facts. I do agree with McHugh that Wing's reference to his health condition is a material fact related to whether he was regarded as disabled, as McHugh argues in his memorandum (Mem. in Opposition at 7), but am struck by McHugh's failure to articulate why Wing's statement or her

18

omission regarding staffing levels is probative of any animus toward the disabled. Indeed, McHugh offers that the actions of Wing and Woodruff, leading up to the refusal to reinstate him, "were consistent with an intent to bring Mr. McHugh back to work." (Id. at 10.) The fact that Wing ultimately told him that he had been replaced and "this is the way it is," in his view, reflects the intrusion of a corporate policy to discriminate against the disabled, likely because of the added insurance costs or the danger of having an employee who might undergo a cardiac event on the job. (Id.) I conclude that McHugh's interpretation of the evidence is speculative and cannot generate the necessary inference of causation. The point here is not that the Court should make an inferential finding that undercuts McHugh's case, but that the evidence McHugh has gathered does not reasonably support the inference that Brink's failed to reinstate McHugh because it did not want an employee with a heart condition.

I find on this record that there is a hole in McHugh's prima facie case of disability discrimination because there is no evidence of a causal connection between McHugh's disability and the refusal to reinstate him. To recognize a causal connection in this case, it would be necessary to find that being replaced during a period of extended leave (well beyond what an employer is required to afford under applicable employment law) is itself sufficient evidence to raise an inference of a discriminatory motive. I conclude that that is not a fair inference to draw, even for a prima facie showing. It might be different if McHugh had produced evidence showing that Brink's still had a present need for his services when he requested reinstatement, or had he produced evidence in support of his own, speculative theories of corporate motivation, but that is not the kind of record that exists here. Indeed, even with respect to the guardsman who went on active duty leave, McHugh fails to demonstrate that any staffing shortfall resulted

19

that would have made it appropriate for Brink's to add another messenger employee to its staff or to train an existing driver to cover for the absent guardsman.

In effect, the record does not demonstrate that the failure to reinstate McHugh in September 2005 (whether to cover runs as a driver or to fill in as a messenger for the absent guardsman) was based on the fact that McHugh had a disability, was regarded as disabled, or had a record of being disabled.[9]

## B.   Prima Facie Whistleblower Retaliation

The prima facie showing required of McHugh's whistleblower claim is similar.  He must demonstrate (1) that he engaged in protected activity;  (2) that he suffered an adverse employment action;  and (3) that a causal nexus exists between the activity and the adverse action.  LePage v. Bath Iron Works Corp., 2006 ME 130, ¶ 19, 909 A.2d 629, 636.  As to the first element, Brink's does not contest it.  As to the second, what has been said above about the existence of an adverse employment action applies with equal force here.  The remaining question is whether McHugh's prima facie showing of whistleblower retaliation fares any better with respect to causation.  According to Brink's, the evidence is insufficient to support a valid inference that its decision not to reinstate McHugh in September 2005 "had anything whatsoever to do with" his whistleblower activity.  (Mot. for Summ. J. at 23.)

---

[9]     McHugh does not pursue a claim for failure to provide a reasonable accommodation, only a claim for disparate treatment in relation to an employment decision.  McHugh presents his case entirely under the McDonnell Douglas rubric, which emphasizes this point, because a failure to accommodate claim follows a different rubric.  See Higgins, 194 F.3d 252, 264 (explaining that a failure to accommodate claim does not require a showing of a discriminatory cause and that "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'").  It does not appear from the record that there was ever any dialogue between the parties addressing McHugh's leave or his reinstatement in terms of the reasonable accommodation requirement.  McHugh has not presented his case in terms of whether it would have been a reasonable accommodation to reinstate him to the next opening he was eligible for, in order to accommodate his need to take extended leave.  Possibly, this is because of limitations set by the scope of the administrative record.

McHugh asserts that the record would support an inference of a causal relationship because Wing and Woodruff (collectively in charge of management, staffing levels, and route coordination) expressed "hostility" toward his objections over smoking (Woodruff) and his opinions about truck maintenance (Wing).  Woodruff, in particular, authored a memorandum to Siefken stating that she was sick of listening to McHugh complain.  (Mem. in Opposition at 17.) I conclude that this evidence does not pass muster, even for purposes of a prima facie showing. First, the comments are from the 2002-2003 timeframe rather than the 2005 timeframe. Temporal proximity can suffice to demonstrate causation at the prima facie stage, but a two-year gap does not amount to temporal proximity.  Second, there is no evidence that Woodruff had any authority in relation to the decision not to reinstate McHugh in September 2005.  Third, when one considers the evidence of Wing's alleged animus, it is not only exceedingly stale, but also exceedingly tepid.  In effect, she told McHugh that truck maintenance was her responsibility, not his.  I do not believe that a reasonable inference of retaliatory motive can be drawn from such an isolated statement made two or more years prior to the challenged employment action.

**C.     Pretext**

Proof of a prima facie case raises a presumption of discriminatory intent and shifts the burden to the employer to produce a legitimate, non-discriminatory justification for the challenged employment action.  I conclude on this record that a prima facie case is not made out because it does not justify an inference that McHugh's disability or whistleblower activity caused Brink's to deny reinstatement to him.  Nevertheless, I address the pretext showing in the event that the Court should disagree with my assessment of the prima facie showing.

The pretext contest turns on the trustworthiness of Brink's representation that it was fully staffed when McHugh sought to be reinstated to his position and whether any evidence calling

21

the justification into question, coupled with the prima facie showing, suffices to generate a reasonable inference of discriminatory motive.  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).  McHugh relies on the fact that Wing did not offer the explanation of being fully staffed when he first spoke with her in September 2005 and also on the fact that she denied that there would be a "problem" preventing him from returning but that he might need to undergo a physical.  (Mem. in Opposition at 4.)  I do not agree with McHugh that Wing's limited statements or omission are enough to support a finding that Brink's was not fully staffed.  Brink's backs up its justification with evidence concerning the number of employees on staff at the time and the number of runs that needed to be covered on different days.  McHugh does not offer any evidence that the staffing level at that time was deficient or that it was less than what existed when he went on leave.  Nor does he offer any evidence that the number of customer runs had increased or that the number of qualified drivers had decreased since his departure.  What he offers in response to the statement that Brink's was fully staffed is a collection of ambiguous circumstances that cannot reliably demonstrate pretext.  To the extent that these additional statements cover new ground, they succeed only in inviting speculation, not a reliable finding of pretext.  McHugh's effort to squarely address the staffing level at Brink's amounts to an assertion that Brink's needs class B drivers on three days of the week and had four employees with class B licenses at its disposal.  That does not show pretext.  McHugh's effort to challenge the justification with circumstantial evidence also falls short.  He offers the fact that people reassured him when he went out on leave that he should not worry about his job and should just focus on getting well.  I fail to understand how this evidence is probative of pretext.  McHugh also offers a statement that Woodruff told him that she could use him "in July or August."  The cited deposition testimony reflects that McHugh's recollection was highly uncertain as to the

22

particular month.  He testified that Woodruff said this to him "in the summertime . . .[,] I want to say around July or August."  (McHugh Dep. 185:24, 186:7.)  Weighed against this uncertain testimony is McHugh admission of a statement offered by Brink's that this conversation took place in "early summer."  (MS ¶¶ 68-69;  NMS ¶ 68.)  The importance of this is that Brink's advertised two positions at the Bangor branch in June of 2005 and filled them in July, while McHugh was on leave.  (MS ¶¶ 140, 142.)  June is early summer in Maine and there were apparently some vacancies at that time, which provides a legitimate explanation for Woodruff's ability to make use of McHugh at that time.  McHugh's uncertainty over the exact month, coupled with his admission that Woodruff's statement was made in "early summer," is not enough to support a reliable inference of pretext.

McHugh also relies on the fact that Brink's failed to give McHugh work during the guardsman's leave.  However, even if the Court credits McHugh's assertion that the guardsman was due to leave in October 2005 (rather than return—as Brink's asserts), McHugh does not demonstrate that the guardsman's absence created a staffing shortage at that time.

In sum, the circumstances of McHugh's case invite speculation, but they do not invite a reasonable inference (*i.e.*, a reliable finding) that the failure to reinstate McHugh in September arose from a discriminatory motive.

### Conclusion

I RECOMMEND that the Court GRANT the defendant's motion for summary judgment (Doc. No. 21).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 12, 2008

24